IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KATHLEEN M. DEGRASSE, on behalf of Plaintiff and the class members described below, </br></br> Plaintiff, </br></br> vs. </br></br> HYUNDAI MOTOR AMERICA (CORPORATION), </br></br> Defendant. | Case No.: 1:24-cv-10688 </br> Honorable Matthew F. Kennelly |

## AMENDED COMPLAINT – CLASS ACTION

### INTRODUCTION

1. Plaintiff Kathleen M. deGrasse brings this action against Defendant Hyundai Motor America (Corporation) ("HMAC") to secure redress for Defendant's unlawful collection, use, storage, and disclosure of Plaintiff's sensitive biometric data.

### PARTIES

2. Plaintiff Kathleen M. deGrasse is a resident of Lincolnshire, Illinois.

3. Defendant HMAC is a California corporation with its principal offices at 10550 Talbert Ave., Fountain Valley, CA 92708. It does business in Illinois. Its registered agent and office is Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703.

4. HMAC is engaged in the importation and distribution of Genesis, Hyundai and Kia automobiles.

### JURISDICTION AND VENUE

5. This case was filed in the Circuit Court of Cook County and removed to this Court by Defendant.

### FACTS RELATING TO PLAINTIFF

6. In July 2024, Plaintiff purchased a new Hyundai Santa Fe from AutoNation Hyundai in Des Plaines, Illinois, after test driving a similar Hyundai vehicle.

7. The Hyundai Santa Fe is equipped with a "Forward Attention Warning System" ("FAWS") that "monitor[s] the drivers eye position using an infrared camera" and "provides an audible warning if it detects a potential lack of driver attention." It also displays a visual warning.

8. Plaintiff asked the salesperson about what features were different between the 2024 Hyundai Santa Fe and the 2022 Hyundai Palisade that Plaintiff owned at the time. The salesperson did not mention the camera aimed at the driver at all.

9. Plaintiff noticed the issue when her car displayed a warning that its FAWS was not operating because she held her arm in a position that blocked the infrared camera.

10. Plaintiff attempted to turn the FAWS off but a notice came up again when she was driving the vehicle.

11. After Plaintiff attempted to switch the FAWS off, she was unable to utilize the cruise control function on the vehicle.

12. Plaintiff found a reference to the FAWS in the owner's manual.

13. After discovering the camera, Plaintiff asked the same salesperson who sold her the vehicle why he did not mention that it had a camera aimed at the driver. The salesperson stated that he was not aware of a camera.

## FACTS – GENERAL

14. The FAWS captures and digitizes the geometry of the driver's face and eyes.

15. On information and belief, the method used is that described in the Hyundai patent attached as Appendix A, which states that the driver's face image is "binarized by means of threshold filtering in which pixels having black level similar to that of eyes are designated as '1's and the other pixels are designated as '0's." The unit "determines a vertical width ($1_{\infty}10$) of a driver's eye by averaging the vertical widths of several parts of one eye . . . and then determines the average vertical width of the driver's eye by averaging the vertical widths of the driver's eye detected over a predetermined period."

16. Other methods of monitoring the driver's attentiveness by means of a camera aimed

at the driver operate in a similar manner.

17. The FAWS compares the geometry over a period of time to determine if the driver is facing forward and focused on the road or is dozing off or otherwise inattentive.

18. According to a Hyundai manual (Appendix B), the FAWS displays a warning if

    a. the driver's gaze is not focused on the road continuously for 3 seconds if the vehicle speed exceeds 20 km./hr.,

    b. the driver's gaze is not focused on the road for 10 seconds or more during any 30 second time span when the vehicle speed exceeds 20 km./hr., or

    c. the driver's eyes are closed for over 2 seconds while the vehicle speed exceeds 10 km./hr.

19. The triggering of the operation of the system at certain speeds requires that the FAWS be connected to the onboard computer in the Hyundai vehicle.

20. The Hyundai manual (Appendix B) states that the FAWS may display a warning even if the driver is focused on the road "because of driving style and driving pattern."

21. On information and belief, this is because the FAWS system is connected to and can be triggered by the lane departure warning system (which measures whether the vehicle is straying outside its lane), steering and the brake and accelerator functions, all of which require that the FAWS system interact with the onboard computer. The Hyundai patent (Appendix A) indicates that the system receives signals from the brake, directional signals, and other controls.

22. If the driver turns off the FAWS or it is not functioning properly, the cruise control function is disabled. This also requires that the FAWS be connected to the onboard computer.

23. Information from the onboard computer can be retrieved by a Hyundai dealer, other repair personnel, and on information and belief, law enforcement personnel, by physical datalink to the computer. In the event of an accident or other incident, the computer can provide information about the driver's operation of the vehicle for a period of time around the accident or incident. On information and belief, this includes the alertness of the driver, inattentiveness being a major cause

of accidents.

24. On information and belief, information from the computer can also be transmitted via the car's BlueLink system. At one point, Hyundai was selling information about driving habits to insurance companies.

25. Hyundai's privacy policy (Appendix C) states that it collects "driver, behavior and usage data, such as: • Vehicle Technologies and Services: as further set forth in the Vehicle Technologies and Services Privacy Notice, we collect and derive personal information through our Vehicle Technologies and Services, including information about you and your vehicle, as well as other users of your vehicle and the Services, such as vehicle usage and performance data, driving data, geolocation data, settings and presets, and features and services accessed and used (including third party provided), and other information related to your use of our Vehicle Technologies and Services."

26. Hyundai or its affiliates has contact information for the person that purchased the car and has it serviced at a Hyundai dealer (who is Hyundai's agent for the purpose of providing warranty and other service), and can reasonably identify the driver.

27. On information and belief, a number of Hyundai vehicles have FAWS, including the Kona, Palisade, Elantra, Sonata, Venue, Tucson, IONIQ 5, IONIQ 6, Santa Cruz, and Santa Fe.

28. No disclosures were provided to Plaintiff or other purchasers and lessees of Hyundai vehicles about what was done with biometric information collected by FAWS or how or where it was stored or how long it would be retained. Plaintiff and other purchasers and lessees were not required to sign anything discussing how biometric information was handled or consenting to the use of their biometric information.

## NOTICE TO HYUNDAI

29. Prior to the sale of the Hyundai automobile to Plaintiff, Hyundai had been criticized for providing consumer driving behavior information to insurance companies. Kashmir Hill, *Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies*, N.Y. Times (Mar. 11,

2024) (Appendix D). Hyundai had been sued for providing such information on June 14, 2024, in *Miller v. Hyundai Motor America,* 8:24cv01288 (C.D.Cal.).

30. This should have caused Hyundai to review all of its practices concerning its obtaining information about consumer driving behavior, including through the means complained of herein. The continued obtaining of biometric information without appropriate written consent was wilful.

## **BIOMETRIC INFORMATION – GENERAL**

31. As indicated by the foregoing, biometrics are not relegated to esoteric corners of commerce. Many businesses – such as Defendant – now use biometric applications.

32. Biometric identifiers such as facial scans are permanent.

33. This exposes persons such as Plaintiff to serious and irreversible privacy risks.

34. For example, if a database containing biometric data is hacked, breached, or otherwise exposed, the subjects have no means by which to prevent identity theft, unauthorized tracking or other unlawful or improper use of this highly personal and private information.

35. A black market already exists for biometric data. Hackers and identity thieves have targeted Aadhaar, the largest biometric database in the world, which contains the personal and biometric data – including fingerprints, iris scans, and a facial photograph – of over a billion Indian citizens. See Vidhi Doshi, *A Security Breach in India Has Left a Billion People at Risk of Identity Theft*, The Washington Post (Jan. 4, 2018).

36. Recognizing the need to protect its citizens from situations like these, Illinois enacted the Biometric Information Privacy Act, 740 ILCS 14/1 et seq. ("BIPA"), to regulate companies that collect and store biometric data in Illinois.

37. Notwithstanding the clear and unequivocal requirements of the law, Defendant disregarded the statutorily protected privacy rights of its customers and unlawfully collected, stored, and used their biometric data in violation of BIPA.

38. Specifically, Defendant violated BIPA because it did not:

a. Properly inform Plaintiff in writing of the specific purpose and length of time for which biometric data was being collected, stored, disseminated, and used, as required by BIPA;

b. Receive a written release from Plaintiff to collect, store, disseminate or otherwise use all types of biometric data, as required by BIPA; and

c. Obtain consent from Plaintiff to disclose, redisclose, or otherwise disseminate all types of biometric data to a third party as required by BIPA.

**BIOMETRIC INFORMATION PRIVACY ACT**

39. In the early 2000s, major national corporations started using Chicago and other locations in Illinois to test "new applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school cafeterias." 740 ILCS 14/5(c).

40. In late 2007, a biometric company called Pay by Touch, which provided major retailers throughout the State of Illinois with fingerprint scanners to facilitate consumer transactions, filed for bankruptcy. As a result, there was a serious risk that millions of fingerprint records – which, like other unique biometric identifiers, can be linked to people's sensitive financial and personal data – could now be sold through the bankruptcy proceedings without adequate protections for Illinois citizens.

41. The bankruptcy also highlighted the fact that most consumers who used the company's fingerprint scanners were completely unaware that the scanners were not actually transmitting fingerprint data to the retailer who deployed the scanner, but rather to the now-bankrupt company, and that their unique biometric identifiers could now be sold to unknown third parties.

42. Recognizing the "very serious need [for] protections for the citizens of Illinois when it [came to their] biometric information," Illinois enacted BIPA in 2008. See *Illinois House Transcript*, 2008 Reg. Sess. No. 276; 740 ILCS 14/5.

43. To ensure compliance, BIPA provides that the prevailing party may recover

$1,000 or actual damages, whichever is greater, for negligent violations and $5,000, or actual damages, whichever is greater, for intentional or reckless violations. 740 ILCS 14/20.

44. BIPA is an informed consent statute which achieves its goal by making it unlawful for a company to, among other things, collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first:

    a. Informs the subject in writing that a biometric identifier or biometric information is being collected, stored and used;

    b. Informs the subject in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

    c. Receives a written release executed by the subject of the biometric identifier or biometric information.

740 ILCS 14/l5(b).

45. Biometric identifiers include retina and iris scans, voiceprints, fingerprints, and scans of hand and face geometry. 740 ILCS 14/10. Biometric information is separately defined to include any information based on an individual's biometric identifier that is used to identify an individual. *Id.*

46. BIPA also establishes standards for how companies must handle Illinois citizens' biometric identifiers and biometric information. See, e.g., 740 ILCS 14/I5(c)-(d). For example, BIPA prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information without first obtaining consent for such disclosure. 740 ILCS 14/l5(d)(l).

47. BIPA also prohibits selling, leasing, trading, or otherwise profiting from a person's biometric identifiers or biometric information (740 ILCS 4/l5(c)) and requires companies to develop and comply with a written policy – made available to the public – establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information

when the initial purpose for collecting such identifiers or information has been satisfied or within three years of the individual's last interaction with the company, whichever occurs first. 740 ILCS 14/l5(a).

48. The Illinois legislature enacted BIPA due to the increasing use of biometric data in financial and security settings, the general public's hesitation to use biometric information, and – most significantly – the unknown ramifications of biometric technology. Biometrics are biologically unique to the individual and, once compromised, an individual is at heightened risk for identity theft and left without any recourse.

49. BIPA provides individuals with a private right of action, protecting their right to privacy regarding their biometrics as well as protecting their rights to know the precise nature for which their biometrics are used and how they are being stored and ultimately destroyed.

50. Unlike other statutes that only create a right of action if there is a data breach, BIPA strictly regulates the manner in which entities may collect, store, use, and disseminate biometrics and creates a private right of action for lack of statutory compliance.

51. As set forth above, Defendant disregarded Plaintiff's legal rights in violation of BIPA.

52. Plaintiff was exposed to the risks and harmful conditions created by Defendant's violations of BIPA alleged herein.

53. Plaintiff is entitled to bring suit to redress the violation of her rights under BIPA. *Rosenbach v. Six Flags Entm't Corp.*, 2019 IL 123186, 129 N.E.3d 1197.

## COUNT I

54. Plaintiff incorporates paragraphs 1-53.

55. Defendant violated 740 ILCS 14/15(b) by failing to obtain informed written consent and releases before obtaining biometric identifiers and information from Plaintiff and the class members.

**CLASS ALLEGATIONS**

56. Plaintiff brings this claim on behalf of a class.

57. The class consists of (a) all individuals (b) who purchased or leased Hyundai vehicles equipped with the "Forward Attention Warning System" (c) where either (i) they resided in Illinois (as shown by Hyundai's records), (ii) they purchased or leased the vehicle from a Hyundai dealer in Illinois, or (iii) the vehicle is registered in Illinois, (d) on or after a date five years prior to the filing of this action.

58. Plaintiff may alter the class definition to conform to developments in the case and discovery.

59. In the present case, Plaintiff alleges, based on the volume of Hyundai's business, that there are more than 40 members of the class, making them so numerous that joinder is impracticable. Hyundai sold 65,611 Santa Fe vehicles during January to July 2024, according to CarFigures (Appendix E). If the distribution of the sales is consistent with the distribution of the national population, Illinois would have accounted for about 5%, or 3,000 vehicles. Other Hyundai models equipped with FAWS would increase this number. The exact number of class members can easily be determined from Hyundai's records and vehicle registrations, and the class members readily identified and located.

60. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

    a. Whether Hyundai captures biometric information;

    b. Whether Hyundai does so without disclosure and consent;

    c. Whether such conduct violates BIPA.

61. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer litigation.

62. Plaintiff's claim is typical of the claims of the class members. All are based on the

same factual and legal theories.

63. A class action is appropriate for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights;

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendant for:

    i. Statutory damages of $5,000 per person for willful and/or reckless violation of BIPA (740 ILCS 14/20(2)) or statutory damages of $1,000 per person for negligent violation of BIPA (740 ILCS 14/20(1));

    ii. Reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3);

    iii. Such other or further relief as is appropriate.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Dulijaza (Julie) Clark
Mairead A. DeWitt
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com
dedelman@edcombs.com
jclark@edcombs.com
mdewitt@edcombs.com

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

> */s/ Daniel A. Edelman*
> Daniel A. Edelman

**DOCUMENT PRESERVATION DEMAND**

Plaintiff hereby demands that defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to plaintiff, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If defendant is aware of any third party that has possession, custody, or control of any such materials, plaintiff demands that defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## **CERTIFICATE OF SERVICE**

  Daniel A. Edelman certifies that on December 18, 2024 this document was filed via ECF, causing a copy to be sent to all counsel of record.

            */s/ Daniel A. Edelman*
            Daniel A. Edelman